193 F.2d 1017
 STARKEY
v.
DIRECTORS OF RECONSTRUCTION FINANCE CORP.
 No. 555.
 United States Emergency Court of Appeals.
 Heard at Clovis, N. M., January 12, 1952.
 Decided February 1, 1952.
 
 Earl E. Hartley, Clovis, N. M., for complainant.
 George Arthur Fruit, Atty. Department of Justice, Washington, D. C., with whom J. Gregory Bruce and E. Leo Backus, Attys. Department of Justice, Washington, D. C., were on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.
 LINDLEY, Judge.
 
 
 1
 Complainant, engaged in slaughtering cattle, at Clovis, New Mexico, has filed his complaint pursuant to Section 204(a) of the Emergency Price Control Act of 1942, as amended, 56 Stat. 23, 50 U.S.C.A.Appendix, §§ 901-946, which is divided into two parts; he complains in one respect because respondent invalidated in toto his subsidy claims for April and the first half of May 1945, and in the other, because respondent required a recomputation of all other claims for the reason that, as initially filed, they failed to classify the cattle slaughtered as "feeders."
 
 
 2
 The facts are not in dispute. It is somewhat difficult to ascertain precisely the legal theory upon which complainant relies. His plea is largely that it is inherently inequitable to require the small business man to keep abreast with the many rules and regulations applicable to such a program as is here involved. Of course our function, fixed by statute, does not extend to any such determination. We may ascertain and decide only whether the acts of respondent complained of are within the authority of the Acts of Congress and the regulations promulgated pursuant thereto.
 
 
 The claims for April and the first half of May, 1945.
 
 
 3
 On April 1, 1945 complainant commenced slaughtering operations at Clovis, New Mexico. As a Class 2 slaughterer (i.e., one operating a non-federally graded plant), he was subject to the terms and provisions of OES Directive 31, 10 Fed.Reg. 1336, and respondent's Revised Regulation No. 3, Sec. 7003.6(c), 10 Fed.Reg. 4242, which provided in substance that subsidy payments were to be limited by a slaughtering quota based upon the amount of cattle slaughtered in an applicant's establishment during the corresponding periods of 1944, or, in the absence of such data, on the basis of slaughter quotas certified by the War Food Administrator or his successor, the Office of Price Administration. Since complainant had not operated the Clovis plant in 1944, only the the latter method was open to him; under it he received a certified quota base on May 16, 1945. Shortly thereafter respondent invalidated the claims for April and the first 15 days of May 1945 because they were not supported by certified quota bases. When respondent denied the claims for April and the first half of May it advised complainant of the procedure by which the latter could obtain a quota base for those periods. On August 3, 1945, respondent again informed complainant of the necessity for a quota for the specified periods and of how he should proceed in order to establish one. Despite these warnings, complainant made no attempt to obtain a quota for April and the first half of May.
 
 
 4
 In view of the clear necessity for an authorized quota and complainant's admitted failure to take the steps essential to its establishment, he can not now be heard to say that respondent's action in invalidating the claims for April and the first half of May 1945, was arbitrary, capricious or not in accordance with law.
 
 
 The "Feeder" "Non-feeder" Dispute.
 
 
 5
 In addition to slaughtering, complainant also fed livestock preparatory to slaughter. Certain of the cattle slaughtered by him for which he subsequently claimed subsidies were fattened by him as a feeder. When they were ready for slaughter, he transferred them from his feed lots to his slaughter pens. Apparently he also slaughtered cattle purchased on the open market immediately prior to slaughter. However, his records did not disclose the respective proportions of "feeders" and "non-feeders" slaughtered.
 
 
 6
 Respondent's Revised Regulation No. 3, Sec. 7003.7(c) (1), (d), 10 Fed.Reg. 4241 provided for filing different claims for "non-feeders" (i. e., cattle purchased by and delivered to the applicant less than thirty days prior to slaughter) and for "feeders" (i.e., cattle purchased by and delivered to the applicant more than 30 days prior to slaughter). This distinction was deemed necessary because different means for computing the amounts of subsidies were employed for the two classes after April 1, 1945. R.F.C. Rev.Reg No. 3, Sec. 7003.5 (d) (1) (2).
 
 
 7
 Complainant filed subsidy claims for the months April 1945 through May 1946, treating all the cattle slaughtered as "non-feeders." These were honored and paid by respondent, save for the April and May 1945 claims previously discussed. Complainant subsequently filed claims for June, September and October 1946, totalling $22,527.20, payment of which was held up, for the reason that early in 1947 respondent had ascertained that, though certain of complainant's cattle had been purchased by him and delivered to his feed pens more than thirty days prior to slaughter, he had reported all on a "non-feeder" basis. Consequently, respondent withheld payments for the latter months until proper adjustments of the previous erroneous payments could be made.
 
 
 8
 Complainant does not deny that he slaughtered cattle held by him as a feeder more than thirty days prior to slaughter but, nonetheless asserts that respondent's action was erroneous. He states, by way of justification, that all cattle held in his feeder pens were transferred on his books to his slaughtering business and then slaughtered within thirty days of such bookkeeping entries, in other words, that his position as an "applicant" for subsidy payments was that of a slaughterer who had owned the cattle slaughtered for less than thirty days.
 
 
 9
 We think it clear that his position is without merit. Both the feeding and slaughtering were conducted by him as an individual proprietor. To allow him to circumvent the purpose and meaning of the regulations by a mere bookkeeping entry would be tantamount to a complete disregard of their existence.
 
 
 10
 Prior to April 1, 1945 the subsidies paid on "non-feeders" were the same as those paid on "feeders." On the latter date, however, the rates paid "non-feeders" were increased over those paid "feeders." Despite this difference, complainant continued to report all his cattle as "non-feeders," qualified to receive the higher rate, although in fact those taken from his feed lots to his slaughter pens were "feeders," carrying the lower rate of subsidy. Nor did complainant report his "non-feeders" separately or supply figures or records from which the respective amounts of the two classes could be ascertained. Consequently, calculation and determination of the proper subsidies due complainant was impossible.
 
 
 11
 Furthermore, inasmuch as subsidy payments on "non-feeders" moved up or down in accord with the degree of cost compliance, it became vital in making proper calculation of the subsidies due complainant to determine his cost and his resulting cost compliance. Consequently complainant's failure to show how much of his slaughter constituted "feeders" and how much "non-feeders" effectually prevented any accurate cost determination, inasmuch as determination of cost under the regulations depended upon the calculated live weight, which was based upon the actual yield in each grade multiplied by the conversion factors. See Evergreen Meat Co. v. R. F. C., Em.App., 1951, 188 F.2d 368, 370, 371. Complainant's failure to supply information as to the actual yield in each grade with respect to "non-feeders" effectually prevented determination of his live weight and, hence, ascertainment of his maximum permissible cost and cost compliance. It follows, we think, in view of the obvious deficiencies of the claims, that respondent would have been amply justified in denying them in toto. See R.F.C.Rev.Reg. No. 3, Secs. 7003.7(d) (2), 7003.9(e).
 
 
 12
 But, though it was within respondent's power wholly to disallow the claims because of their inherent insufficiency, it pursued a different course of action, adopting a less severe alternative. After extended correspondence with complainant, respondent concluded that it would be only fair that all claims should be recomputed on a "feeder" basis. The only alternative to this action would have been a complete denial of the claims. The recomputation suggested resulted in a substantial reduction of the previously honored claims, with a consequent claim receivable of $14,744.90 being asserted against complainant. The June, September and October 1946 claims totalling $22,527.20 were reduced by $2,499.69 and the claim receivable was set off against them, with a resultant final payment of $5,282.61 to complainant. Inasmuch as complainant does not controvert the facts relied upon by respondent, the record discloses no basis for a determination by us that the orders complained of were arbitrary, capricious or contrary to law.
 
 
 13
 Judgment will enter dismissing the complaint.